No. 30,462.

The Fort Scott Building and Loan Association, *Appellee*, v. Paul H. McAfee and Maryland Casualty Company, *Appellants*.

(10 P. 2d 851.)

Opinion filed May 7, 1932.

*Spencer F. Harris* and *Paul G. Koontz,* both of Kansas City, Mo., for the appellants.

*C. E. Hulett* and *Douglas Hudson,* both of Fort Scott, for the appellee.

The opinion of the court was delivered by

Harvey, J.: Plaintiff brought this action against its treasurer and the surety on his fidelity bond. A jury was waived. The trial court made findings of fact and rendered judgment for plaintiff. The surety has appealed.

Briefly the facts may be stated as follows: In January, 1921. Paul H. McAfee was made treasurer of the plaintiff building and loan association and continued to act in that capacity until about May 1, 1930. During that time he was president and the active managing officer of the People's State Bank at Fort Scott. In January, 1921, the surety company, in consideration of premiums paid, agreed that it would reimburse plaintiff for any loss not exceeding $5,000 of moneys, securities, or other personal property which plaintiff might sustain by reason of any act or acts of fraud, dishonesty, forgery, embezzlement, wrongful abstraction, or willful misapplication on the part of McAfee while in the performance of his duties as treasurer of plaintiff occurring during the continuance of the bond. This bond was kept in force by the payment of additional annual premiums until January 24, 1930, on which date it was discontinued as to future transactions, being replaced by a similar bond, with the same surety, but with McAfee as principal. During the time here in question E. G. Atkins was secretary of the plaintiff association and also a vice president of the People's State Bank, and C. E. Hulett was president of the plaintiff association. At a meeting of the board of directors of the plaintiff association on July 7, 1929, the treasurer was directed to make an investment for the association in government securities, the specific directions being to buy $5,000 worth of United States treasury notes to run to December 15, 1929. On August 6 McAfee advised the plaintiff's secretary that he had obtained the United States treasury notes, and on that date McAfee was given a check for $5,112.28, being the face of the treasury notes, with accrued interest, signed by the secretary and vice president of the plaintiff association. While this check was made payable to the People's State Bank, it was in fact given to McAfee, plaintiff's treasurer, who at that time exhibited to Atkins what he represented to be the United States treasury notes purchased. The trial court found that in fact McAfee did purchase the United States treasury notes and had them in his possession as plaintiff's treasurer on August 6, but thereafter, and perhaps in September or October of 1929, McAfee did wrongfully abstract, embezzle and misapply them and convert them, or the proceeds thereof, to his own use without the knowledge of the president, secretary, or other officers of plaintiff association. About December 31, 1929, in order to conceal from plaintiff and its other officials the embezzlement and disposition of the United States treasury notes, McAfee made out a deposit slip on the bank in favor of the plaintiff association in the

sum of $5,059.38 and caused that amount to be credited to the plaintiff association in the bank, representing that as the amount received by him at the maturity of the United States treasury notes. The plaintiff association then directed the investment of $5,000 in United States fourth Liberty loan bonds. About December 31, 1929, McAfee represented to plaintiff's secretary that the bonds had been received, and a similar check of the association was given to McAfee for $5,125.75 in payment of such bonds. At the time the check was given to him McAfee represented that he had the bonds in the denomination of $5,000 in his possession.

The trial court was unable to find from the evidence whether McAfee in fact purchased such bonds, but did find that he either embezzled the amount of the check then given him in payment of the bonds, or if he purchased the bonds, that he later embezzled the bonds. On September 6, 1929, the association, by appropriate action, directed the purchase of $7,500 worth of federal certificates of indebtedness bearing date of September 16, 1929, and due June 16, 1930. About September 30, 1929, McAfee advised plaintiff's secretary that he had received such certificates of the par value of $7,500, and the check of plaintiff association in that sum was given McAfee in payment of such certificates. At the time this check was delivered to him McAfee exhibited to Atkins papers which he represented to be such certificates. The trial court was unable to find whether McAfee purchased such certificates for plaintiff, but found that if he did not do so he embezzled the amount of the check given him for that purpose, and that if he did purchase them he later wrongfully embezzled such certificates. Early in October, 1929, an examiner for the department of the commissioner of building and loan associations, examining plaintiff's records, found them to show the investment of $5,000 in government bonds and $7,500 in federal certificates of indebtedness, and went to McAfee, as plaintiff's treasurer, to verify those items. McAfee reported to the examiner that he had, as plaintiff's treasurer, United States treasury certificates of indebtedness, $5,000, due December 16, 1929; also similar certificates, $7,550.09, due June 15, 1931. On the examiner's report, showing this in the handwriting of McAfee, was "Above certificates held for safe-keeping," directly under which, having been placed there by a rubber stamp, was "The People's State Bank, Fort Scott, Kansas, P. H. McAfee, president." Plaintiff's treasurer had never been authorized by its board of directors,

or any of its officers, to place its securities with the bank for safe-keeping, and they knew nothing of any such transaction. On May 1, 1930, McAfee absconded. No federal bonds, or certificates of indebtedness, belonging to plaintiff could be found. The bank commissioner took charge of the People's State Bank and found it to be in bad condition financially, apparently having been wrecked by the defalcations and embezzlements of McAfee. About the third week in May, 1930, McAfee was apprehended, returned to Fort Scott, and placed in jail. On the same day Mr. Hulett, plaintiff's president, talked with him with reference to the handling of the securities and moneys of the plaintiff association. Hulett asked McAfee what had become of plaintiff's bonds, and McAfee said he had disposed of them. He further stated that he never purchased any bonds except the first $5,000 worth, and that he had disposed of them before October, 1929; that the $7,500 worth he never purchased at all. Mr. Hulett's testimony as to this conversation was received over appellant's objection.

The appellant surety company contends it was error for the court to admit in evidence the declarations of McAfee made to Mr. Hulett, president of the association, in the latter part of May, after McAfee had been apprehended and returned to Fort Scott, for the reason that such declarations were not made during the time of his employment as treasurer, or in connection with his duties as such. In this connection it cites the general rule from 22 C. J. 405 as follows. (We italicize portions emphasized by appellant):

"In cases of suretyship, an admission of the principal, when made in good faith, *in connection with the obligations or duties to which the suretyship relates,* is competent against the *surety,* although not to the extent of varying *his liability* or of determining the rights of several sureties as between themselves. Competent admissions may be made by word of mouth, contained in books or other writings, or evidence by silence or acquiescence. *Where the obligation of the surety is for the proper performance by the principal of the duties of an office or a position, the declaration* is competent only if made while the principal occupied such office or position; . . . Admissions made prior to the execution of the obligation, or narrative statements made after breach of the obligation, or *after expiration of the time* for which the surety is held, cannot be received against the surety. . . ."

A number of cases are cited in connection with the various clauses of the text, many of which are quoted from or analyzed by appellant. An exhaustive annotation of cases on the question may be found in 60 A. L. R. 1500 to 1547. A few later cases are: *Piggly*

*Wiggly Yuma Co. v. New York Indemnity Co.,* [Cal.] 3 P. 2d 15; *Bank of Oak Ridge v. Duncan,* [Mo.] 40 S. W. 2d 656; *United States Fidelity & Guaranty Co. v. Benson H. Co.,* 222 Ala. 429, 132 So. 622; *United States Fidelity & Guaranty Co. v. Bank of Thorsby,* 46 F. 2d 950. It will not be necessary for us to analyze these cases. The text above quoted is a fair synopsis of them, so far as here pertinent.

The particular statements of McAfee which appellant objects to and deems incompetent are those which related to whether or not he purchased the securities with the checks furnished him by plaintiff for that purpose, and what he did with them, or how he handled the matter after they were purchased. It is true, as argued by appellant, that it indemnified plaintiff against loss because of McAfee's acts rather than his conversation; that is, it indemnified against his embezzlements, wrongful abstractions, etc., rather than against what he may have said about it at some time after his services with plaintiff ceased, for what he may have said under such circumstances may have been true or false.

There are several reasons why this testimony was not wrongfully received in evidence in this case. *First,* McAfee was a party defendant, and the evidence was properly received as against him in any event. *Second,* it scarcely can be said that McAfee's duties as treasurer of the plaintiff had ceased at the time of this conversation. It is true the petition alleged that he was plaintiff's treasurer from the time of his appointment to "about May 1, 1930," and at the trial there was a stipulation in the same terms. That was the day McAfee absconded, but he had not been succeeded by anyone as treasurer, he had not closed up his books with plaintiff, and on his being brought back to Fort Scott, about three weeks later, which was the first time the officers of plaintiff had an opportunity to talk with him after they had some information of his defalcations, it was perfectly proper for the officers to inquire of him about securities held by him as treasurer for plaintiff. It was his duty to give an account of such securities, and the statements he made in attempting to give such account were directly in connection with his business and his duty to plaintiff. He had not at that time been formally removed as treasurer of plaintiff, nor had any successor been chosen. The bond sued on covered the time of this conversation. Certainly the second bond did, and even the first bond which, as to subsequent transactions was superseded on January 4, 1930, indemnified against

losses discovered "during the continuance of this bond, or within six months after its termination"; hence, in accordance with the great weight of authority above referred to, the evidence was competent as against the surety. *Third,* from the court's findings it is clear that the judgment against the surety in this case was not based on this testimony, for the court specifically found that it could not tell from the evidence just how McAfee handled those securities and whether certain of them were purchased or not. If the court believed and followed the testimony of McAfee those findings would not have been made. *Fourth,* it does not make much difference how McAfee handled the money given him to purchase securities for plaintiff, or what he did with the securities after they were purchased, if in fact he did not have them when called upon to account for them, and if he had in the meantime wrongfully used, embezzled, or abstracted the money given him to purchase such securities, or the securities after they had been purchased. It is clear from this record that he did not have such securities, that he had wrongfully abstracted and embezzled the money or securities and was unable to produce them or account for them to the officers of the association when called upon for that purpose. That created a liability on the bond, without regard to what he said to Mr. Hulett.

Appellant further contends that since the checks of plaintiff association, signed by the secretary and its president or vice president, were made payable to the People's State Bank, of which McAfee was president, and since they were given to McAfee, they were of necessity given to him as president of the bank and not as treasurer of plaintiff, and argues that the embezzlements and wrongful misappropriations of the proceeds of these checks were acts of McAfee as president of the bank rather than as treasurer of the plaintiff. This contention lacks merit. The treasurer of the association was the one instructed by its board of directors to purchase the securities. The secretary and president or vice president who signed the checks were not so authorized by the resolution of plaintiff's board of directors. When McAfee as treasurer of the association notified its secretary that securities which plaintiff had ordered purchased had been received by the bank and were ready to be delivered to the association on payment, the secretary and president or vice president executed plaintiff's check for their purchase and gave it to McAfee, treasurer of the association, to use for that purpose. The fact that it was made payable to the bank rather than to McAfee as treasurer

is of no consequence. McAfee as treasurer of the association had no authority to deliver this check to the bank until he had delivered to him, as treasurer of the association, the securities for which the check was in payment.

There is no error in the record, and the judgment of the trial court is affirmed.